Zaven BILEZIKJIAN, Plaintiff,

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA, et al., Defendants.**

Case No.: SA CV 07–1438 AHS (ANx).

United States District Court,
C.D. California,
Southern Division.

Jan. 25, 2010.

Jeffrey C. Metzger, Jeffrey C. Metzger Law Offices, Laguna Hills, CA, Michael

Anthony Penn, Aitken Aitken and Cohn, Santa Ana, CA, for Plaintiff.

Edwin A. Oster, Barger and Wolen, Los Angeles, CA, Jenny H. Wang, Barger and Wolen, Irvine, CA, for Defendants.

ORDER: (1) DENYING PLAINTIFF'S MOTION FOR (2) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ALICEMARIE H. STOTLER, District Judge.

## I.

### INTRODUCTION

Plaintiff suffers from carpal tunnel syndrome (CTS) as a result of his performing "big-bone" orthopedic surgeries for many years. His disability income insurance policies with the insurer defendants provide for coverage of a disability—inability to perform one's occupational duties—that results from "accidental bodily injury" occurring while each policy is in force. Because the insurer defendants contend that plaintiff's disability is not covered by the policies, plaintiff brought claims for breach of contract and breach of the implied covenant of good faith and fair dealing. The case finds itself in a federal forum after defendant removed the action based on diversity of citizenship, signifying that California's substantive law must be applied to resolve the parties' pending cross-motions for summary adjudication or judgment. In the absence of controlling authority by the state supreme court, state intermediate appellate court decisions will govern unless there is convincing evidence that the state's supreme court would not likely follow them. The Court concludes that, under applicable state appellate court decisions, defendants are entitled to judgment because plaintiff's disability is not an "accidental bodily injury" under the California law governing interpretation of the policies in issue.

## II.

### PROCEDURAL BACKGROUND OF PENDING MOTIONS

Dr. Bilezikjian brought suit against Unum Life Insurance Company of America and Unum Group (collectively, "Unum Life") in the Superior Court for the State of California, County of Orange, on November 6, 2007, alleging claims for breach of contract and breach of the duty of good faith and fair dealing. On December 13, 2007, Unum Life answered and removed the action pursuant to 28 U.S.C. § 1441(b).

On August 10, 2009, Unum Life filed a motion for summary judgment, or in the alternative partial summary judgment, as to both of Dr. Bilezikjian's claims as well as his prayer for punitive damages. On the same date, Dr. Bilezikjian also filed a motion for partial summary judgment on the ground that his disabling condition constitutes an "injury" as a matter of law under his three disability income insurance policies. On August 31, 2009, all parties filed opposition to the respective motions for summary judgment or partial summary judgment, and on September 4, 2009, all parties filed replies. The motions came on for hearing on October 19, 2009, at the conclusion of which the Court took the matters under submission. On January 19, 2010, Dr. Bilezikjian filed a "sur-reply" to point out new California Supreme Court authority.

## III.

### SUMMARY OF FACTUAL HISTORY

A. Plaintiff's Disability

Dr. Bilezikjian is an orthopedic surgeon who practiced until becoming disabled in 2000 from CTS. (Declaration of Zaven Bilezikjian ("Bilezikjian Decl."), Ex. 3 at 42; Declaration of Jeffrey C. Metzger ("Metzger Decl."), Ex. 11, 60:6–11, 62:16, 64:6–

10.) His surgical practice consisted of big-bone surgeries such as knee and hip replacements, which involved forceful hand activities requiring extensive use of screwdrivers, tapping instruments, saws, drills, chisels, and hammers. (Metzger Decl., Ex. 11, 60:6–10, 67:24–68:3; Ex. 12, 76:4–7, 79:1–5.) The machinery used in his medical procedures "vibrate[d] like crazy against bone." (Metzger Decl., Ex. 11, 67:25–68:1.)

Dr. Bilezikjian was first diagnosed with CTS in 1992. (Bilezikjian Decl., Ex. 8 at 71; Metzger Decl., Ex. 11, 60:22–61:10.) His symptoms consisted of pain, numbness, and loss of dexterity when performing his surgical activities. (Metzger Decl., Ex. 11, 60:11–12, 25.) He underwent bilateral endoscopic release surgery in August 1992, which allowed him to return to his surgical practice. (Bilezikjian Decl., Ex. 8 at 71; Metzger Decl., Ex. 11, 61:12–22.) Sometime in 1998 or 1999, the pain, numbness, and loss of dexterity returned. (Metzger Decl., Ex. 9 at 8; Ex. 11, 61:24–62:10.) His treating physician, Richard Braun, M.D., diagnosed plaintiff with bilateral recurrent CTS caused by his work activities, which was exacerbated by the scar tissue that had developed from his first surgery. (Metzger Decl., Ex. 10 at 57:3–20; Ex. 12, 75:23–77:2.) Dr. Bilezikjian underwent a second carpal tunnel release surgery in July 2000. (Metzger Decl., Ex. 9 at 8; Ex. 11, 63:8–10.) He has been unable to continue his surgical practice since that time. (Metzger Decl., Ex. 11, 62:14–19, 63:13–19.)

**B. Insurance Policies**

Dr. Bilezikjian purchased four disability income policies from Unum Life, three of which are at issue in this case (collectively, "Policies"): (1) LAN530516: issued August 1, 1975; (2) LAN571805: issued October 15, 1977; and (3) LAN635270: issued February 24, 1981. (Bilezikjian Decl., Ex. 1 at 3; Ex. 2 at 15; Ex. 3 at 32; Ex. 7 at 68.)

All Policies contain an identical "Insuring Provision," which states that Unum Life insures against "disability and loss, as indicated in the Schedule," subject to any provisions, exceptions and reductions contained in the Policies, that results from:

(a) Sickness or disease of the Insured which first manifests itself while this policy is in force, hereafter called "sickness," or

(b) Accidental bodily injury occurring while this policy is in force, hereafter called "injury."

(Bilezikjian Decl., Ex. 1 at 3; Ex. 2 at 15; Ex. 3 at 32.) The terms "sickness," "accidental," and "injury" are not further defined in the Policies. (*See* Bilezikjian Decl., Exs. 1–3.)

The Policies' "Benefit Provisions" section provides benefits in the event of "Total Disability—Sickness" and "Total Disability—Accident." (Bilezikjian Decl., Ex. 1 at 4, 6; Ex. 2 at 16, 19; Ex. 3 at 33, 35.) The Policies define "Total Disability" as follows:

"Total disability" means the inability of the insured to perform the duties of his regular occupation. However, the total loss by the Insured of the use of both hands, both feet, or one hand and one foot, or the total loss of speech, hearing of both ears, or sight of both eyes shall be deemed to constitute a "Total Disability" so long as such total loss of use, speech, hearing, or sight shall continue, irrespective of whether the Insured engages in his or any other gainful occupation.

(Bilezikjian Decl., Ex. 1 at 11; Ex. 2 at 23; Ex. 3 at 39.) The maximum benefit period for the Policies terminated on the later of the following two events: (1) "Age 65 policy anniversary," or (2) "24 months after disability payments commence." (Bilezikjian Decl., Ex. 1 at 5; Ex. 2 at 17; Ex. 3 at 34.) The Policies also exclude "any loss

caused by war or any act of war, whether declared or undeclared," and stated that "[u]nder no circumstances will the Insured be considered to be suffering from more than one total disability at the same time." (Bilezikjian Decl., Ex. 1 at 6; Ex. 2 at 19; Ex. 3 at 35.)

Dr. Bilezikjian purchased two disability riders—one for "Accident Total Disability" and the other for "Sickness Total Disability Commencing Before Age 50"—that provided lifetime monthly benefits "in consideration of payment of the Rider Premium." (Bilezikjian Decl., Ex. 1 at 9–10; Ex. 2 at 21–22; Ex. 3 at 37–38.) The sickness rider provided lifetime benefits for total disability resulting from sickness before age 50, while the accidental injury rider provided lifetime benefits for injuries occurring before the policy's anniversary, which occurs on or following the insured's sixty-fifth birthday. (*Id.*) Both riders stated that payment of benefits would be made "as long as such total disability continues." (*Id.*) The riders did not further define "accident" or "sickness." (*See id.*)

## C. Plaintiff's Disability Claims

After becoming disabled in March 2000, Dr. Bilezikjian filled out a claim form under his policies with Unum Life, including the three policies at issue in this case. (Declaration of Scott J. Shea ("Shea Decl."), Ex. 4.) He described his disabling condition as "recurrent bilateral carpal tunnel syndrome and multiple trigger fingers." (Shea Decl., Ex. 4 at 2.) He stated that his condition has impacted his daily living in the following ways: "I have stopped doing surgery. Hands are painful [and] stiff all the time. Cannot do any sports. Difficulty sleeping." (*Id.*) He indicated that he first noticed the symptoms in 1992, and when the form queried: "If injury, where and how did the injury occur," he drew a line, ostensibly indicating that the question was inapplicable. (*Id.,*

Ex. 4 at 1.) He also left the box blank under "Date the injury occurred." (*Id.*)

On May 18, 2000, Unum Life sent a letter to Dr. Bilezikjian indicating that it was "accepting liability" on his claims. (Bilezikjian Decl., Ex. 6 at 66.) It enclosed a check in the amount of $10,875.00, and stated that his policies provided a maximum monthly indemnity of $18,875.00. (*Id.*) The Policies at issue in this case contributed approximately $5,000 to that monthly maximum. (Bilezikjian Decl., Ex. 1 at 5; Ex. 2 at 17; Ex. 3 at 34.) In the same May 18, 2000 correspondence, Unum Life indicated that payment was being made under the "sickness" provision: "Under the Sickness provision of your policies, your elimination period is 30 days." (Bilezikjian Decl., Ex. 6 at 66.)

On September 24, 2001, Dr. Bilezikjian called Unum Life to ask whether he would receive lifetime benefits under the Policies because his CTS was caused by an accidental injury. As recorded in Unum Life's "claim department phone memo," Dr. Bilezikjian told Unum Life's representative that "his carpal tunnel was due to an accident, therefore he is entitled to lifetime benefits." (Shea Decl., Ex. 10.) The representative recorded a response to the caller that "carpal tunnel syndrome is not caused by accidental trama [sic], but occurs overtime [sic] and is considered a sickness." (*Id.*) The representative also reported that this view about carpal tunnel syndrome was company policy, but that Unum Life would accept and evaluate any additional information Dr. Bilezikjian submitted about his condition, including letters from an attorney. (*Id.*)

On August 21, 2006, Unum Life responded in writing to Dr. Bilezikjian's 2001 inquiry and advised him that his benefits under the Policies would be terminated on the policy anniversary following his sixty-fifth birthday because he had reached the

maximum benefit period.[1] (Bilezikjian Decl., Ex. 7 at 70.) In the letter, Unum Life stated that the accidental injury rider did not apply to Dr. Bilezikjian's disabling condition of CTS: "California state law stipulates that a specific identifiable event is required to qualify as accidental." (*Id.*, Ex. 7 at 69.)

In reaching this conclusion, Unum Life undertook a clinical assessment to determine whether Dr. Bilezikjian's CTS was due to an accident. (*Id.*; Shea Decl., Ex. 12.) Without explicitly stating that Dr. Bilezikjian was totally disabled as defined under the Policies, it nevertheless found that Dr. Bilezikjian could no longer "do forceful gripping and fine manipulation required in [his] profession as an orthopedic surgeon." (Bilezikjian Decl., Ex. 7 at 69.) As such, "[i]t has been determined that [Dr. Bilezikjian has] reached maximum medical improvement and no further treatment is necessary." (*Id.*; Shea Decl., Ex. 12.) However, the letter went on to discuss the "etiology of carpal tunnel syndrome" as described by Unum Life's in-house orthopedic consultant John Groves, M.D. According to the letter, the consultant opined:

> [C]arpal tunnel syndrome occurs in individuals who have a predisposition to develop carpal tunnel syndrome by virtue of a congenitally narrow carpal tunnel.[2] Carpal tunnel syndrome itself is caused by pressure of the medial nerve in the hand in the carpal tunnel caused by flexor tenosynovitis in an already narrowed canal. Flexor tenosynovitis is

generally considered to be the result of minor trauma to the flexor tendons in the form of repetitive and forceful gripping and extension of the fingers. The flexor tenosynovitis then compresses the medial nerve resulting in carpal tunnel syndrome. Minor repetitive trauma resulting in flexor tensynovitis [sic] can be caused by activities of normal daily living as well as the use of hands in an occupation.

(*Id.*) Based on this etiology, defendants concluded that "there appears to be no single incident of trauma, and underlying factors apart from tenosynovitis appear to be absent...." (*Id.*, Ex. 7 at 70; Shea Decl., Ex. 12.) Thus, Dr. Bilezikjian's CTS "developed based on tenosynovitis and a pre-disposition to carpal tunnel syndrome by virtue of a narrow carpal tunnel and by activities of daily living as well as working and any hobbies involving the use of finger flexion/extension, and gripping of the hand." (*Id.*) Accordingly, Unum Life determined that his disabling condition of CTS "is not considered to be due to an accident." (Bilezikjian Decl., Ex. 7 at 70.)

**D. Medical Expert Opinions on Plaintiff's Disabling Condition**

Dr. Bilezikjian's expert, Martin Cherniack, M.D., and his treating surgeon, Dr. Braun, agree that Dr. Bilezikjian's CTS developed from forceful hand activities required by his surgical practice. (Metzger Decl., Ex. 9 at 18–20; Ex. 12, 78:5–79:5.) Both physicians agree that his CTS developed over a period of time through the

1. Dr. Bilezikjian had a fourth policy with Unum Life, LAN67272, which contained both sickness and injury lifetime riders. (Bilezikjian Decl., Ex. 7 at 70.) Neither rider had expired when he became disabled in 2000. (*Id.*) Unum Life continues to pay benefits under this policy. (*Id.*)

2. This etiologic view is disputed by Dr. Bilezikjian's expert, Martin Cherniack, M.D. Ac-

cording to Dr. Cherniack's report, the view that "cts occurs in individuals who have a predisposition to develop carpal tunnel syndrome by virtue of a congenitally narrow carpal tunnel" is an "etiologic view that once had a certain currency ... two to three decades ago," but now is "at best eccentric and far out of the mainstream" with respect to males. (Metzger Decl., Ex. 9 at 7.)

repetitive use of his hands in his practice, and it is likely that no single event triggered his CTS. (Metzger Decl., Ex. 9 at 17–20; Ex. 12, 77: 3–21, 82:9–23.) However, Dr. Cherniack's report states that "there is no convincing evidence to support the proposition that Dr. Bilezikjian's CTS reflected an underlying illness or predisposition that simply appeared in the workplace," but there is "rather strong evidence that the pattern of symptoms has elements of an obligate workplace injury." (Metzger Decl., Ex. 9 at 20.) Dr. Braun takes the view that Dr. Bilezikjian's CTS "is a type of trauma that occurs with repetitive activities which we would call accumulative trauma." (Metzger Decl., Ex. 12, 80:15–19.) And, Unum Life's expert, Dr. Groves, accepts that Dr. Bilezikjian's occupation was a major factor in developing CTS. (Declaration of Jenny H. Wang ("Wang Decl."), Ex. E, 53:2–23.) In short, as Unum Life acknowledges in its Motion for Summary Judgment, all parties agree that "the condition underlying Dr. Bilezikjian's disability—carpal tunnel syndrome—was caused by repetitive use of his hands in connection with his occupational activities as an orthopedic surgeon." (Defendants' Memorandum of Points & Authorities in Support of Summary Judgment, 6:20–23.)

## IV.

### *SUMMARY OF PARTIES' CONTENTIONS*

#### A. Plaintiff's Motion

As a matter of law, Dr. Bilezikjian's disabling condition constitutes an "injury" under the three disability income insurance policies in issue. First, there is no dispute that he is totally disabled. Given that each insurance policy separates disabilities into two categories, one for "accidental bodily injury" and the other for "sickness or disease," combined with the fact that there is no evidence that his CTS

disability was a result of sickness, he must be covered under the accidental bodily injury category of his Policies. A virtually identical case under Georgia law involving a physician disabled by CTS so held. *See Hallum v. Provident Life & Accident Ins. Co.*, 326 F.3d 1374 (11th Cir.2003). Second, coverage under the accidental bodily injury rider is consistent with California law, which recognizes a distinction between policies that cover "accidental means," i.e., unforeseen injuries arising out of involuntary acts, and those that cover "accidental results," i.e., unforeseen injuries arising out of voluntary acts. Because the Policies did not limit coverage to "accidental means," they must be construed to cover accidental results. And, since CTS was an unforeseen injury arising out of his voluntary practice of surgery, it should be deemed an accidental result and thus covered under the Policies. *See Weil v. Fed. Kemper Life Assurance Co.*, 7 Cal.4th 125, 27 Cal.Rptr.2d 316, 866 P.2d 774 (1994). Third, the California Insurance Commissioner prohibited the use of the phrase "accidental means" in California disability policies and mandated that policies covering both "sickness" and "injury" be designed to avoid any possible confusion in coverage. Thus, insurers cannot restrict the meaning of accidents to "accidental means," and the Policies at issue in this case are at best ambiguous, which further supports coverage. Finally, the only California case that supports Unum Life's position is not controlling. *See Gin v. Penn. Life Ins. Co.*, 134 Cal. App.4th 939, 36 Cal.Rptr.3d 571 (2005). Although Gin held that CTS is not an "accidental bodily injury," it involved a different type of insurance policy, misconstrued governing California law, and would lead to an unresolvable ambiguity if followed. Plaintiff is entitled to a summary adjudication of liability on his claims.

## B. Defendants' Motion for Summary Judgment

As a matter of law, Dr. Bilezikjian's claim for breach of contract fails because there was no single precipitating "accident" that caused his disability. *See Gin,* 134 Cal.App.4th at 940, 36 Cal.Rptr.3d 571. There is an "accidental" requirement for injuries under the Policies, not met here, because it is undisputed that Dr. Bilezikjian's disability is a progressive condition that developed over years of practice as an orthopedic surgeon. No one "intends" to become disabled, and allowing recovery for a disability caused by routine, work-related activities would render the term "accidental" meaningless for insurance purposes. There is no need to address whether Dr. Bilezikjian's disability constitutes a "sickness" because that question is not properly before the Court, and Dr. Bilezikjian, as plaintiff, has the burden to prove coverage. The claim for breach of the implied covenant of good faith and fair dealing fails absent an underlying breach of contract. Even if there were an underlying breach of contract, the fact that there was a "genuine issue" regarding coverage precludes liability. Finally, there is no basis to award punitive damages. Defendants are entitled to summary judgment on all claims.

## V.

### *APPLICABLE LEGAL STANDARDS*

Summary judgment is proper when the "pleadings, the discovery and disclosure materials on file, and any affidavits" demonstrate "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine "if the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Material facts are those which, under applicable substantive law, may affect the outcome of the case. *Id.*

■■■■ Diversity cases in federal court are governed by the substantive law of the forum state. *See Ins. Co. of the State of Penn. v. Assoc'd Int'l Ins. Co.,* 922 F.2d 516, 520 (9th Cir.1990). Courts are required to " 'approximate state law as closely as possible' and are bound by the pronouncements of the state's highest court." *Chalk v. T–Mobile USA, Inc.,* 560 F.3d 1087, 1092 (9th Cir.2009) (quoting *Ticknor v. Choice Hotels Int'l, Inc.,* 265 F.3d 931, 939 (9th Cir.2001)). "In the absence of controlling forum law, a federal court sitting in diversity must use its own best judgment in predicting how the state's highest court would decide the case." *Takahashi v. Loomis Armored Car Serv.,* 625 F.2d 314, 316 (9th Cir.1980). While a "court may be aided by looking to well-reasoned decisions from other jurisdictions" when there is no controlling decision by the state supreme court, *id.,* the court "must follow the state intermediate appellate court decisions unless the [court] finds convincing evidence that the state's supreme court likely would not follow it," *Chalk,* 560 F.3d at 1092 (quoting *Ryman v. Sears, Roebuck & Co.,* 505 F.3d 993, 994 (9th Cir.2007)).

## VI.

### *REVIEW OF AUTHORITIES*

#### A. Plaintiff's Claim for Breach of Contract

##### 1. Plaintiff's Cases

CTS is properly classified as a "injury" under plaintiff's disability income insurance policies that define "injury" as an "accidental bodily injury." The line of cases beginning with *Hallum v. Provident Life & Accident Ins. Co.,* 257 F.Supp.2d

1373 (N.D.Ga.2001),[3] provides the proper framework to evaluate his claim because the disability policy in *Hallum* is identical to the one at issue here, and Georgia law is consistent with California law. For these reasons, the approach in *Hallum* should be adopted over the California Court of Appeal's analysis in *Gin,* 134 Cal.App.4th at 939, 36 Cal.Rptr.3d 571.

### a. Plaintiff: *Hallum,* a case under Georgia law, held that CTS is an "accidental bodily injury"

In *Hallum,* a physician was declared totally disabled from CTS at age 61 as a result of repetitive hand motions required by his obstetrics and gynecology practice of nearly thirty years.[4] 257 F.Supp.2d at 1375, 289 F.3d at 1352–53. The physician submitted a claim to his insurance company under his disability income policy, which provided total disability benefits if his disability was due to sickness or injury. *Hallum,* 289 F.3d at 1351–52. The policy defined "injuries" as "accidental bodily injuries occurring while your policy is in force," and "sickness" as "sickness or disease which is first manifested while your policy is in force." *Id.* The policy did not further define "accidental bodily injury" or "sickness," but provided benefits for 48 months if his disability was due to a "sickness" starting at the age of 61 but before the age of 62, and lifetime benefits if due to an "injury." *Hallum,* 257 F.Supp.2d at 1375. The policy also stated that a disability "caused by more than one Injury or Sickness or from both will not matter" because it would "pay benefits for the dis-

ability which provides the greater benefit." *Provident Life & Accident Ins. Co. v. Hallum,* 276 Ga. 147, 148, 576 S.E.2d 849, 851 (2003).

The insurance company paid monthly benefits under the "sickness" provision of the policy for 48 months but refused to approve the physician's claim for benefits under the "injuries" provision. *Hallum,* 289 F.3d at 1352. According to the company, the physician "sustained no injury or trauma to his hands, such as a sprain or broken bone," and he was told by his physicians that his condition "developed over an extended period of time." *Hallum,* 257 F.Supp.2d at 1376. The physician filed an action in Georgia state court to obtain a determination whether his disability was due to "injury" or "sickness" under the policy, which action was thereafter removed to the United States District Court for the Northern District of Georgia. *Hallum,* 289 F.3d at 1352.

The district court granted summary judgment in favor of the physician, finding that the policy language was ambiguous and use of the term "accidental" described the physician's resulting disability instead of the cause of his injury. *Hallum,* 257 F.Supp.2d at 1380–81. First, the court found that there was an ambiguity in the policy that favored coverage: "failure to delineate what constitutes an injury or a sickness ... [as well as failing to provide] the extent of its liability when there is competing science on the causes of a disability" favors coverage. *Id.* at 1380. The

---

**3.** *Hallum* resulted in four reported decisions: (1) *Hallum v. Provident Life & Accident Ins. Co.,* 257 F.Supp.2d 1373 (N.D.Ga.2001); (2) *Hallum v. Provident Life & Accident Ins. Co.,* 289 F.3d 1350 (11th Cir.2002); (3) *Provident Life & Accident Ins. Co. v. Hallum,* 276 Ga. 147, 576 S.E.2d 849 (2003); and (4) *Hallum v. Provident Life & Accident Ins. Co.,* 326 F.3d 1374 (11th Cir.2003).

**4.** The physician's CTS symptoms first appeared in 1994, but worsened due to the repetitive use of his hands in his practice which required "grasping surgical instruments and flexing of the writs to perform vaginal examinations." 257 F.Supp.2d at 1376. Hands splits, steroid injections, and surgery failed to alleviate his condition, which was later declared "permanent and irreversible." *Id.*

court explained that there is a "a very definite distinction between 'accidental injuries' and 'injuries resulting from accidental means'" under Georgia law. *Id.* at 1381 (citation omitted). "Where an injury is unexpected but arises from a voluntary action it is an 'accidental injury,' but for an injury to result from accidental means, it must be the unexpected result of an unforseen [sic] or unexpected act which was involuntarily and unintentionally done.'" *Id.* (citation omitted). Based on this distinction, the court rejected the insurance company's argument that "repetitive motion injuries result[ing] from voluntary, intentional conduct" cannot be categorized as "accidental." *Id.* According to the court, the policy defined "injuries" simply as "accidental bodily injuries that occur while this policy is in force." *Id.* Such a definition "describe[s] the nature of the injury itself, and not the cause of the injury." *Id.* Thus, the insurance company's restrictive interpretation of "accidental" must be rejected. *Id.*

On appeal, the Eleventh Circuit certified the following question to the Georgia Supreme Court:

> Whether, under Georgia law, carpal tunnel syndrome, which is caused by repetitive hand motion, is more properly classified as an "injury" under the provisions of a disability income insurance policy which define an "injury" to mean "accidental bodily injuries occurring while your policy is in force," or whether carpal tunnel syndrome is more properly classified as a "sickness" under the provisions of the same policy which define "sickness" to mean "sickness or disease which is first manifested while your policy is in effect?"

*Hallum,* 289 F.3d at 1354 (all capitals in original). The Georgia Supreme Court responded, holding that "under Georgia law, a person who unexpectedly suffers from carpal tunnel syndrome brought on by years of voluntary repetitive hand movements that renders him disabled has suffered an 'injury,' as that term is defined in this Provident Life insurance policy." *Hallum,* 276 Ga. at 147, 576 S.E.2d 849.

The Georgia Supreme Court first discussed the distinction between coverage for "accidental injuries" and coverage for injuries caused by "accidental means." *Id.* at 147–48, 576 S.E.2d 849. The court explained that the "insurance contract here uses the words 'accidental bodily injuries,' which, in the context of this policy, means a bodily injury that was unexpected, but could have arisen from a conscious or voluntary act." *Id.* at 148, 576 S.E.2d 849. "By using 'accidental' to modify 'bodily injuries,' as opposed to modifying the cause or means of any injuries, the Provident Life policy places the focus of the coverage on the injuries, not the means that caused the injury." *Id.* The court rejected the insurance company's argument that the word "accidental" limited recovery to injuries resulting from "a discrete event that occurred at a certain time and place" because the policy "specifically contemplate[d] that a disability could be the result of more than one injury or sickness or a combination of the two." *Id.* Moreover, when the disability was caused by more than one injury or sickness, or from both, the policy promised to pay benefits for the disability providing the greater benefit. *Id.* Under the terms of the policy, "[a] person could suffer a series of small traumas over an extended period that ultimately resulted in a bodily injury that was disabling," and be covered under the policy because it was an unexpected bodily injury occurring during the policy period. *Id.* Thus, the physician's CTS was covered under the policy because it "cover[ed] bodily injuries that resulted from a series of actions over an extended period, as well as those that were caused by a single cataclysmic event." *Id.*

### b. Plaintiff: California law is consistent with *Hallum*

*Hallum* should be followed because California law, like Georgia law, recognizes the distinction between policies that cover "accidental means" and those that cover "accidental results," which was confirmed by the California Supreme Court in *Weil v. Federal Kemper Life Assurance Co.*, 7 Cal.4th 125, 129, 27 Cal.Rptr.2d 316, 866 P.2d 774 (1994). *Weil* involved liability under a life insurance policy with a double indemnity provision that covered death by "accidental means." *Id.* at 130, 27 Cal. Rptr.2d 316, 866 P.2d 774. After the insured died by overdosing on cocaine, the beneficiaries claimed benefits under the policy. *Id.* at 130–31, 27 Cal.Rptr.2d 316, 866 P.2d 774. The applicable policy provision provided benefits for:

> [T]he loss of life as the direct result of bodily injury, independent of all other causes, effected solely through external, violent and accidental means, as evidenced by a visible contusion or wound on the exterior of the body (except in the case of drowning or internal injuries revealed by an autopsy), and that the date of death occurred within ninety days after such injury.[5]

*Id.* at 130, 27 Cal.Rptr.2d 316, 866 P.2d 774 (emphasis omitted). The beneficiaries argued, *inter alia*, that the insured was covered "even if the cause of death had been acute cocaine poisoning from voluntary ingestion of cocaine" because the insured "did not intend to injure himself or cause his own death." *Id.* at 131, 27 Cal.Rptr.2d 316, 866 P.2d 774. In doing so, they advanced two alternative legal theories to support their position: (1) the distinction between the coverage afforded by "accidental means" policies and "accidental death" policies should be abolished, and (2) "accidental means" policies afford coverage when some unexpected event occurs that joins the insured's conduct to the cause of death, and an "unintended drug overdose constitutes such an unexpected event." *Id.* at 133, 27 Cal.Rptr.2d 316, 866 P.2d 774.

The court rejected the beneficiaries' arguments, holding that "the distinction in policy language between 'accidental means' and 'accidental results,' recognized in our prior decisions, should be preserved,[6] and second, that the voluntary ingestion of a known hazardous and illegal substance does not provide a basis for coverage within the terms of an insurance policy affording coverage for death by 'accidental means.'" *Id.* at 129–30, 27 Cal.Rptr.2d 316, 866 P.2d 774. In reaching this decision, the court explained that jurisdictions such as California that "that have developed the distinction between 'accidental means' and 'accidental results'"[7] have construed the latter category of "accidental death" broadly, "such that the injury or death is likely to be covered unless the

---

5. The policy contained a number of exclusions, including one for suicide, committing an assault or felony, disease, bodily or mental infirmity, and medical or surgical treatment. *See Weil*, 7 Cal.4th at 130, 27 Cal.Rptr.2d 316, 866 P.2d 774.

6. The court noted that "as of 1992, 22 jurisdictions, including California, expressly recognized the distinction between 'accidental means' and 'accidental death,' whereas 25 jurisdictions expressly have rejected or repudiated this distinction." *Weil*, 7 Cal.4th at 138, 27 Cal.Rptr.2d 316, 866 P.2d 774.

7. The development of this distinction was explained as follows: early insurance policies were simple and covered "accidental death or injury," but this changed "when it became evident to insurers that a policy providing coverage for accidental death would be construed by the courts to encompass far greater risks than insurers had anticipated in issuing this type of policy." *Weil*, 7 Cal.4th at 135 n. 5, 27 Cal.Rptr.2d 316, 866 P.2d 774. Thus, the phrase "accidental means" was employed in order "to limit liability by defining more precisely the risk insured." *Id.*

insured virtually intended his injury or death." *Id.* at 140, 27 Cal.Rptr.2d 316, 866 P.2d 774 (quoting *Collins v. Nationwide Life Ins. Co.,* 409 Mich. 271, 294 N.W.2d 194 (1980)). "Accidental means," on the other hand, limits liability of insurance companies for unintended results .of the insured's voluntary acts unless there was (1) an "intervening accident or an accidental element," or (2) the "effect [of a voluntary act] is not the natural, probable, or expected consequence of the means that produced it." *Id.* at 141, 27 Cal.Rptr.2d 316, 866 P.2d 774. Applying this distinction to the facts before it, the *Weil* court recognized that the insurance policy limited coverage to "accidental means" and that voluntarily ingesting cocaine was outside of coverage because the "risks attending the consumption of [illegal substances such as cocaine] are so great that death must be considered a common, natural or substantially likely consequence." *Id.* at 148, 27 Cal.Rptr.2d 316, 866 P.2d 774.

Dr. Bilezikjian's policies, like the policy in *Hallum,* did not limit liability to injuries caused by "accidental means." Instead, the Policies define "injury" as an "accidental bodily injury." Because California law recognizes the distinction between "accidental results" and "accidental means," and "uncertainties in a insurance contract are resolved against the insurer and in favor of imposing liability," his policies should be construed to cover accidental results such as CTS. *See Olson v. American Bankers Ins. Co.,* 30 Cal.App.4th 816, 824–25, 35 Cal.Rptr.2d 897 (1994) (holding that an insurance policy covered "accidental death" because it "failed to use the term 'means,'" and thus was ambiguous.)

### c. Plaintiff: The California Insurance Commissioner's bulletins support coverage

· Dr. Bilezikjian offers a series of bulletins by the California Insurance Commissioner which apparently proscribe the use of the phrase "accidental means" in disability policies.[8] (Plaintiff's Memorandum of Points & Authorities in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Opp."), Docket No. 21, Exs. 1 & 2.) California Insurance Bulletin 72–15, which was issued October 31, 1972, states that "[a]ll individual disability policy forms hereafter submitted to this Department for approval are subject to the requirements specified in Phase I and Phase II of these Guidelines."[9] (*Id.,* Ex. 1 at 18.) In Phase II of the Guidelines, under the section entitled "DEFINITIONS[:] POLICY OF ACCIDENT AND SICKNESS INSURANCE (CIC Secs. 10275; 106; 380)," it states:

> Injury[ ] should be defined in relation to bodily injury due to accident and the time such bodily injury was sustained by the person insured. Benefits may not be predicated upon loss occurring through "accidental means"; "violent and external means"; "solely"; or "solely and exclusively".

---

**8.** At the October 19, 2009 hearing, the Court granted Dr. Bilezikjian's request to take judicial notice of the California Insurance Bulletins submitted with his opposition to Unum Life's motion for summary judgment. (*See* Plaintiff's Opp., Docket No. 21, Exs. 1–2 [Insurance Bulletin]; Docket No. 27 [Minutes granting request for judicial notice].)

**9.** Plaintiff also cites California Insurance Code § 10350 for the proposition that "disability insurers are required to obtain approval to include policy provisions that deviate from the statutory requirements." However, § 10350 states that disability insurers must obtain approval when substituting a different provision from those "specified in Sections 10350.1 to 10350.12, inclusive." The language identified in the judicially-noticed bulletins does not appear anywhere in Sections 10350.1 to 10350.12. Dr. Bilezikjian fails to demonstrate the binding effect, if any, of the judicially-noticed bulletins.

(Plaintiff's Opp., Ex. 1 at 24, ¶ 7(b)).) That section also mandates that "[p]olicies providing both accident and sickness coverages should be designed to avoid any possible confusion as to the respective hazards insured and the benefits applicable to the respective coverages for losses due to accident and those due to sickness." (*Id.* at 24, ¶ 5.) According to Dr. Bilezikjian, the clear implication from prohibiting benefits predicated on loss by "accidental means" is that insurers cannot restrict the meaning of accidents to "accidental means." Moreover, the Policies at issue here failed "to avoid any possible confusion as to the respective hazards insured and the benefits applicable to the respective coverages for losses due to accident and those due to sickness," which further supports coverage.

#### d. Plaintiff: *Gin* is not controlling

The only California case supporting Unum Life's position is not controlling. *See Gin v. Penn. Life Ins. Co.*, 134 Cal. App.4th 939, 36 Cal.Rptr.3d 571 (2005). Gin was a full-time data entry clerk for United Parcel Service ("UPS") who developed CTS from "the repetitive trauma of typing at a computer keyboard." *Id.* at 941, 36 Cal.Rptr.3d 571. On September 13, 1996, she obtained a disability insurance policy from Pennsylvania Life Insurance Company ("Penn Life"). *Id.* The policy was an "accident benefit policy" that provided monthly disability benefits in the event that "Injury causes Total Disability which starts within 90 days after the date of the accident and continues through the end of the Elimination Period." *Id.* "Injury" was defined as an "accidental bodily injury sustained (1) directly and independently of disease or bodily infirmity, or any other causes; and (2) while this Policy is in force." *Id.* "Total Disability" was

defined to mean "that you and your Covered Spouse are unable to engage in any employment or occupation for which you or your Covered Spouse, are or become qualified by reason of education, training or experience." *Id.*

Four days after the policy issued, Gin experienced pain in her right side in her shoulder, arm, and neck while working at UPS's accounting office. *Id.* She acknowledged that there was no traumatic event that occurred before she felt pain. *Id.* When filling out an Injury/Illness Report that asked "[w]hat object or substance directly injured the employee?," she stated "[t]he repetition of entering data via keyboard." *Id.* at 941–42, 36 Cal.Rptr.3d 571. Later, she stated that "[t]he trauma associated with my symptoms is typing." *Id.* at 942, 36 Cal.Rptr.3d 571. Penn Life initially paid policy benefits for five months but discontinued them after Gin completed a vocational rehabilitation program in connection with her workers compensation claim. *Id.* Gin sued Penn Life for breach of contract, which Penn Life defended by claiming that her disability was not caused by an "accidental bodily injury" as required by the policy. *Id.*

The California Court of Appeal affirmed the superior court's ruling that "under California case law, a disability that is the culmination of repetitive stresses caused by the insured's normal, everyday activities is not the result of an 'accidental bodily injury' and therefore does not fall within the coverage of the policy." *Id.* at 943, 36 Cal.Rptr.3d 571. The appellate court rejected Gin's argument that an "accident" either "causes injury" or is the "unforeseen consequence of a causative occurrence (her typing at work)." *Id.* at 944, 36 Cal.Rptr.3d 571. According to the leading California case [10] that defined "accident" in

---

**10.** *See Khatchatrian v. Cont'l Cas. Co.*, 332 F.3d 1227, 1228 (9th Cir.2003) ("The seminal California Supreme Court case interpreting

'accident' is *Geddes & Smith, Inc. v. Saint Paul–Mercury Indemnity Co.*, 51 Cal.2d 558,

the context of property insurance:

No all-inclusive definition of the word "accident" can be given. It has been defined "as 'a casualty—something out of the usual course of events and which happens suddenly and unexpectedly and without design of the person injured.'" It "'includes any event which takes place without the foresight or expectation of the person acted upon or affected by the event.'" "Accident, as a source and cause of damage to property, within the terms of an accident policy, is an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause."

*Id.* (quoting *Geddes & Smith, Inc. v. Saint Paul–Mercury Indem. Co.*, 51 Cal.2d 558, 334 P.2d 881 (1959)) (citations omitted). Gin used the last sentence of this quotation from *Geddes & Smith* to argue that her CTS disability "was the unexpected, unforeseen consequence of a causative occurrence (her typing at work)," but the court held that this interpretation "ignored important limiting language in *Geddes & Smith*," namely, "that the events in question had 'occurred suddenly.'" *Id.* This limiting language "places Gin's injury outside of the California Supreme Court's definition of 'accident,' because Gin freely admits that her disability was caused by a series of imperceptible 'micro-traumas' from typing which finally culminated in a tangible harm." *Id.*

Moreover, the court held that Gin's chosen definition of accident, i.e., "if it either causes injury *or* if it is the consequence of a causative occurrence," is too broad because "it is difficult to imagine what would fall outside of the definition." *Id.* at 945, 36 Cal.Rptr.3d 571. As the court explained:

Every event may be considered, in some sense, the "consequence of a causative occurrence." Accepting such a defini-

tion would effectively remove the word "accidental" from the phrase "accidental bodily injury." As the *Williams* court correctly pointed out, "if it is to be held that an activity normally engaged in becomes an accident because the effect thereof, without more, is on a given occasion extraordinary, the term accident has, for insurance coverage purposes at least, no meaning at all."

*Id.* at 945, 36 Cal.Rptr.3d 571 (quoting *Williams v. Hartford Accident & Indem. Co.*, 158 Cal.App.3d 229, 234, 204 Cal.Rptr. 453 (1984)). With respect to Gin's injury, the court stated that "[t]yping at a keyboard was an activity in which Gin normally engaged" and "did not become an 'accident' merely because the cumulative effect of a long period of typing was the onset of carpal tunnel syndrome." *Id.*

The *Gin* court ruled that, because of differences in fact and applicable law, the out-of-state authorities cited by Gin, such as the Georgia Supreme Court's opinion in *Hallum*, did not change the analysis. *Id.* at 945 n. 3, 36 Cal.Rptr.3d 571. First, the court in *Hallum* "construed a policy with a somewhat different, and perhaps broader, definition of 'injury.'" *Id.* Second, and more importantly, "Georgia law appears inconsistent with California law in that the former does not require 'a specific incident that resulted in [the insured's] condition' before the disability will be deemed the result of an 'accidental bodily injury.'" *Id.* (citing *Alessandro v. Mass. Cas. Ins. Co.*, 232 Cal.App.2d 203, 208–09, 42 Cal.Rptr. 630 (1965), for the proposition that "'accident' is something outside of the usual course of events that happens suddenly and unexpectedly and without the design of the insured").

According to Dr. Bilezikjian, *Gin*'s holding that CTS is not an "accidental bodily injury" is not controlling. *Gin* involved

334 P.2d 881 (1959), authored by Justice Rog- er Traynor.")

interpretation of an accident benefit policy, which is a different type of disability insurance than the policy at issue here. This distinction is important because the court in *Gin* was not required to determine whether the insured's CTS was more accurately classified as a "sickness" or an "injury." Had the court faced that decision, it might have reached a different result. More significantly, *Gin* misconstrued governing California law when it distinguished *Hallum* by requiring a "specific incident" for an accidental injury. *Gin,* 134 Cal. App.4th at 945 n. 3, 36 Cal.Rptr.3d 571. Under the California Supreme Court's holding in *Weil,* California continues to recognize the distinction between "accidental results" and "accidental means." 7 Cal.4th at 129–30, 27 Cal.Rptr.2d 316, 866 P.2d 774. *Gin* did not once mention *Weil,* and cursorily dismissed *Hallum* in a footnote on the ground that California law was more restrictive than Georgia law. Under an "accidental results" analysis, like the one performed in *Hallum, Gin* might well have come out differently. Lastly, were the Court to follow Gin and require a "single, sudden event" to precipitate an "accidental bodily injury," it would create a category of disabilities—namely, "non-accidental injuries," that fall outside of disability coverage. Such possible ambiguity favors coverage. *Cf. Steven v. Fid. & Cas. Co.,* 58 Cal.2d 862, 874–75, 27 Cal.Rptr. 172, 377 P.2d 284 (1962) ("air-taxi carriers are neither included in, nor excluded from, the coverage of the [insurance] policy," which "creates an ambiguity" favoring coverage).

### 2. Defendants' Cases

*Gin v. Penn. Life Ins. Co.,* 134 Cal. App.4th 939, 36 Cal.Rptr.3d 571 (2005), stands squarely for the proposition that CTS is not considered an "accidental bodily injury" under California law. *Gin,* 134 Cal.App.4th at 940, 36 Cal.Rptr.3d 571. As the *Gin* court recognized, no one "intends" to become disabled, and allowing recovery for a disability caused by routine, work-related activities would render the term "accidental" meaningless for insurance purposes. *Id.* at 945, 36 Cal.Rptr.3d 571. It is undisputed that Dr. Bilezikjian developed CTS from the forceful hand activities required year after year by his surgical practice, and *Gin* unequivocally held that such a disability, which is a "culmination of repetitive stresses caused by the insured's normal, everyday activities," is not an "accidental bodily injury" under California law. *Id.* at 943, 36 Cal.Rptr.3d 571.

*Gin* also establishes that Dr. Bilezikjian has the burden to prove coverage under the terms of the applicable policy provisions. *Id.* at 943, 36 Cal.Rptr.3d 571 (stating that it was plaintiff's burden "to establish that [her] disability occurred as a result of an 'accidental bodily injury' within the meaning of that term as used in the policy.'" (citation omitted)). The issue here is not as plaintiff would have it, that is, whether Dr. Bilezikjian's CTS is *either* "sickness" *or* an "injury," but rather whether Dr. Bilezikjian can establish that CTS is an "accidental bodily injury" under the Policies. The Court need not address whether Dr. Bilezikjian's disability constitutes a "sickness" because that is not the issue; rather, the Court need only consider whether plaintiff's disability is an "accidental bodily injury." As the court held in *Gin,* a disability caused by the cumulative of effect of the insured's normal, work-related activity is not an "accident." *Id.* at 945, 36 Cal.Rptr.3d 571.

### a. Defendants: California courts have consistently required a sudden, precipitating event for an "accidental bodily injury"

*Gin* is not the first California court to require a sudden, precipitating event for an "accidental bodily injury." The oldest

of the cases, *Alessandro v. Massachusetts Casualty Ins. Co.,* 232 Cal.App.2d 203, 204–05, 42 Cal.Rptr. 630 (1965), concerned a disability insurance contract that covered total and partial disabilities caused by either accidents or sickness. The insured operated a business repairing and maintaining refrigeration and air conditioning equipment. *Id.* at 205–06, 42 Cal.Rptr. 630. One day, after 16 years of servicing equipment, he tried to straighten up after bending over to replace a control and "experienced pain radiating from his back to his left leg," feeling "as though his body from the waist down was paralyzed." *Id.* He claimed benefits under his policy for "total disability caused by accidental bodily injury." *Id.* at 205, 42 Cal.Rptr. 630.

The court adopted the definition of "accident" as articulated by Justice Traynor in *Geddes & Smith,* meaning "something out of the usual course of events and which happens suddenly and unexpectedly and without design of the person injured," or "any event which takes place without the foresight or expectation of the person acted upon or affected by the event," because "[t]his definition has been used in many cases in this jurisdiction where the word 'accident' is found in a policy without any qualifying phrase such as 'accidental means' or 'external, violent, and accidental means.' [Citations]." *Id.* at 208, 42 Cal.Rptr. 630. Based on the foregoing definition of "accident," the court held that the insured's disability was not an "accidental bodily injury" because there was "no evidence of falling, slipping, overexertion, or of any external force striking the body of the [insured]." *Id.* at 209, 42 Cal.Rptr. 630. Instead, the insured "was doing his usual work, in the usual way," and there was nothing "outside 'the usual course of

events' which happened 'suddenly and unexpectedly without any design of the' [insured] except the result, that is, the fact that the appellant could not immediately straighten up and was subsequently disabled." *Id.* (quoting *Rock v. Travelers' Ins. Co.,* 172 Cal. 462, 465, 156 P. 1029 (1916)). Consequently, there was no evidence that the insured was covered under the "accidental" provisions of his policy.[11] *Id.*

Nearly twenty years later, in *Williams v. Hartford Accident and Indemnity Co.,* 158 Cal.App.3d 229, 234–35, 204 Cal.Rptr. 453 (1984), the Court of Appeal reaffirmed the holding of *Alessandro* in the context of an accidental death and dismemberment insurance policy. In *Williams,* when the insured went for his routine morning jog, he did not "fall, bump into anyone, or even stop suddenly," experience any pain, or notice any "obstruction in the field of vision of his right eye." *Id.* at 230–31, 204 Cal.Rptr. 453. Later that morning, however, he was diagnosed as having a detached retina in his right eye. *Id.* at 231, 204 Cal.Rptr. 453. His eye later hemorrhaged, which ultimately resulted in the permanent loss of sight in that eye after unsuccessful surgery. *Id.* The insured's policy provided benefits of "$75,000 when the loss of sight in one eye '[results] from injury sustained by the insured.' " *Id.* at 232, 204 Cal.Rptr. 453. "Injury" was defined as "bodily injury sustained by the insured … caused by an accident occurring while this policy is in force … and which results directly and independently of all other causes in loss covered by this policy." *Id.* (omissions in original). The policy explicitly excluded loss resulting from "[s]ickness or disease, or medical or

---

11. The court added that "the record discloses that the [insured] was unquestionably suffering from a degenerative intervertebral disc disease and had a long history of health prob-

lems with his back," and went on to affirm the trial court's finding that the insured's disability "was caused by sickness." *Alessandro,* 232 Cal.App.2d at 209, 210, 42 Cal.Rptr. 630.

surgical treatment thereof." *Id.* Based on the foregoing, the court noted that "the only injuries compensable under the policy were those caused by an 'accident,' a term not specifically defined in the policy." *Id.*

On appeal, the insurance company adopted the definition of "accident" used in *Alessandro* and argued that "an 'accident' does not occur in the absence of some intervening element of force or violence, in a context of a happening 'not according to the usual course of things.'" *Id.* at 233, 204 Cal.Rptr. 453. The insured responded that even if loss of his eyesight could be attributed, at least in part, to a preexisting disease, that does not relieve the insurance company of liability "if the accident sets in progress the chain of events leading directly to death [or injury], or if it is the prime or moving cause." *Id.* (citation omitted). While sympathetic to the insured's loss, the court affirmed the trial court's decision denying recovery. The court explained:

> [I]f it is to be the case one may recover under an accident policy of insurance (with its correlatively reduced premium costs) for an injury which in some final analysis may be traced to what would otherwise be a commonplace act, because the injury transforms that act into an "accident," there is nothing to distinguish the accident policy from an "ordinary" or "standard" form of disability insurance policy (with its corresponding-ly higher premium costs).

*Id.* at 234, 204 Cal.Rptr. 453. Thus, to focus on the occasionally "extraordinary" result of what would otherwise be a normal activity—without a sudden or unexpected intervening event—would mean that the term "accident has, for insurance coverage purposes at least, no meaning at all." *Id.*

**b. Defendants: *Nehra,* decided under Michigan law, held that CTS is not an "accidental bodily injury"**

Unum Life points to Michigan law, a state also distinguishing between "accidental results" and "accidental means," which has held that CTS is not an "accidental bodily injury" under a disability income policy virtually identical to the Policies at issue here. *See Nehra v. Provident Life & Accident Ins. Co.,* 454 Mich. 110, 559 N.W.2d 48 (1997). In *Nehra,* a dentist was diagnosed with CTS and a duodenal ulcer with hemorrhage after many years of practice. *Id.* at 111, 113, 559 N.W.2d 48. The dentist submitted a claim to his insurance company under his disability income policy, which provided total disability benefits if his disability was due to sickness or injury. *Id.* at 112–13, 559 N.W.2d 48. The policy defined "injuries" as "accidental bodily injuries occurring while your policy is in force," and "sickness" as "sickness or disease which is first manifested while your policy is in force." *Id.* at 112, 559 N.W.2d 48. The policies did not further define "accidental bodily injuries," but provided benefits through the age of 65 if his disability was due to a "sickness" and lifetime benefits if his disability was due to an "injury." *Id.* at 113, 559 N.W.2d 48. On his claim form, the dentist "answered the questions related to a 'sickness,' and left unanswered the questions relating to an 'accident' or 'injuries.'" *Id.* When asked to describe the "[n]ature and details of sickness," he answered: "Duodenal ulcer with hemorrhage; 4/24/85–Bilateral carpal tunnel syndrome." *Id.* The insurance company began paying disability benefits under the "sickness" provision of the policy. *Id.* Over time, the ulcer resolved itself, but the dentist's CTS continued. *Id.* Two years after filing his initial claim, the dentist "sought to recharacterize his carpal tunnel syndrome as an 'injury'-related disability rather than a 'sickness,'" but the

insurance company refused. *Id.* When the dentist turned 65 and benefits stopped, he sought declaratory relief in state circuit court that his CTS was an "injury." *Id.*

The circuit court granted summary disposition for the insurance company on the ground that the dentist's CTS was not an "accidental bodily injury." *Id.* at 114, 559 N.W.2d 48. In doing so, it relied on no-fault insurance cases that defined accidental bodily injury as "an injury sustained in a single accident, having a temporal and spatial location." *Id.* (citation omitted). The Michigan Court of Appeal set aside the summary disposition, stating that the principles relied upon by the circuit court were limited to no-fault cases. *Id.* at 115, 559 N.W.2d 48. According to the court of appeal, the phrase "accidental bodily injury" as used in the policy was ambiguous:

> Although the contract attempts to define the term "injury," the language employed may reasonably be interpreted as having multiple meanings. Put simply, it is unclear from the definition whether the *cause* or the *results* must be "accidental." Such language is not clear and unambiguous.

*Id.* To support its position, the court cited *Collins v. Nationwide Life Ins. Co.*, 409 Mich. 271, 275, 294 N.W.2d 194 (1980), which recognized that distinctions have arisen among policies that use the terms "accidental means," "accident," and "accidental bodily injuries." *Id.* Because the insurance policy did not indicate whether the *"cause* of the injury must be unanticipated or whether the resulting *injury* must be unanticipated," the insurance company was liable. *Id.*

The Michigan Supreme Court reversed. *Id.* at 118, 559 N.W.2d 48. First, the court acknowledged that "words like 'injury' and 'accident' can have shifting meanings, depending on the factual context and the area of law in which they are being considered." *Id.* at 116, 559 N.W.2d 48. Thus,

the body of law governing worker's compensation claims has developed concepts such as "last-day-of-work" injuries that are not common elsewhere in the law. *Id.* Similarly, no-fault insurance benefits for "accidental bodily injury" are payable where there has been "a single accident, having a temporal and spatial location." *Id.* However, the present case is not as complex as the court of appeal made it appear because the dentist suffered no discrete injury. *Id.* at 117, 559 N.W.2d 48. The court explained:

> It is true that, in unusual cases, the word 'accident' can be ambiguous in the sense explained in *Collins*—the distinction between accidental (unanticipated) cause and an accidental (unintended) outcome. However, the word is not ambiguous insofar as its ordinary meaning includes the temporal and spatial elements discussed in the no-fault cases. Thus, if Mr. Collins had drunk himself to death over many years, gradually eroding his vital organs, instead of poisoning himself on a single occasion, there would have been no "accident" in either of the senses discussed in *Collins*.

*Id.* at 117–18, 559 N.W.2d 48. The court concluded that "[w]ithout the temporal/spatial component, the word 'accidental' adds almost nothing to the phrase 'accidental bodily injuries,'" and "[i]f 'accidental' injury can occur naturally over a long period of time, then the only injuries that are not accidental are those that are intentionally inflicted." *Id.* at 118 & n. 13, 559 N.W.2d 48. The court observed that the dentist himself "recognized the true nature of his disability when he initially identified it as a 'sickness,' not an 'accidental bodily injur[y].'" *Id.* at 118, 559 N.W.2d 48. And, even though CTS could be deemed a *"chronic* injury" in another context, the circuit court did not err in concluding it was a sickness "as between a sickness and

an *accidental* bodily injury." *Id.* at 118 n. 14, 559 N.W.2d 48.

#### c. Defendants: *Weil* does not change the analysis put forward in *Gin* or *Nehra*

Cases such as *Weil*, 7 Cal.4th at 125, 27 Cal.Rptr.2d 316, 866 P.2d 774 and *Olson*, 30 Cal.App.4th at 816, 35 Cal.Rptr.2d 897, which employ a distinction between "accidental results" and "accidental means" do not change the analysis here. In fact, this distinction between "accidental results" and "accidental means" appears exclusively in California cases involving life insurance and "accidental death" policies. There is no California case holding that normal disability policies [12] shall be construed as "accidental results" policies if they do not employ the words "accidental means," and *Alessandro*, *Williams*, and *Gin* stand for the contrary position. More fundamentally, cases such as *Weil* and *Olson* involved an identifiable, sudden event that immediately preceded the insured's death. In *Weil*, the insured died immediately following a lethal overdose of cocaine. 7 Cal.4th at 130–31, 27 Cal.Rptr.2d 316, 866 P.2d 774. In *Olson*, the insured died after drinking alcohol, taking Valium, and then "accidentally" drowning in a hot tub. 30 Cal.App.4th at 821, 35 Cal.Rptr.2d 897. In both cases, the voluntary actions that led to accidental death immediately preceded the actual death triggering liability under the policies. There is no California case holding that prolonged activities spanning years leading to death, such as chronic drinking or drug use, should be considered "accidental results" under an accidental death policy. Were a court to

do so, all but suicides would be characterized as "accidental."

### C. Plaintiff's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

#### 1. Plaintiff's Position

Dr. Bilezikjian contends that there is a triable issue of fact as to Unum Life's denial of coverage based on the following facts: (1) there was no evidence of sickness to support Unum Life's denial of coverage; (2) it relied on a incorrect medical opinion when it denied coverage; (3) it has attempted to force Dr. Bilezikjian to prove coverage based on an "accidental means" analysis that has been forbidden by the California Insurance Commissioner; and (4) it has attempted to enforce an ambiguous policy when the California Insurance Commissioner required that policies covering "sickness" and "injury" be written to avoid coverage confusion. Because summary judgment is appropriate only when it is "indisputable that the basis for the insurer's denial of benefits was reasonable," *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir.2002), summary judgment should be denied.

#### 2. Defendants' Position

Unum Life contends that Dr. Bilezikjian's claim for breach of the implied covenant of good faith and fair dealing fails absent an underlying breach of contract. And, even if there were an underlying breach of contract, the fact that there was a "genuine issue" regarding coverage precludes liability.

---

12. California Insurance Code § 106(a) states that "[d]isability insurance includes insurance appertaining to injury, disablement or death resulting to the insured from accidents, and appertaining to disablements resulting to the insured from sickness." Accordingly, under California law, an accidental death policy is considered a disability policy. Thus, the "normal" disability policies referenced in this sentence excludes accidental death insurance policies.

Absent an underlying breach of contract, there is no basis for a claim of breach of the implied covenant. *Love v. Fire Ins. Exch.*, 221 Cal.App.3d 1136, 1153, 271 Cal. Rptr. 246 (1990). "The covenant of good faith and fair dealing is implied in law to assure that a contracting party 'refrain[s] from doing anything to injure the right of the other to receive the benefits of the agreement.'" *Id.* (quoting *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141 (1979)). Thus, the "covenant is implied as a *supplement* to the express contractual covenants." *Id.* "Absent that primary right, however, the *auxiliary* implied covenant has nothing upon which to act as a supplement, and should not be endowed with an existence independent of its contractual underpinnings." *Id.* Here, Dr. Bilezikjian's claim for breach of contract fails as a matter of law, which precludes recovery under his second claim for breach of the implied covenant.

Alternatively, the existence of a genuine issue regarding coverage precludes finding breach of the implied covenant even if Dr. Bilezikjian's breach of contract claim were valid. *See Franceschi v. Am. Motorists Ins. Co.*, 852 F.2d 1217, 1220 (9th Cir.1988) (stating that "a court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, even if the court concludes the claim is payable under the policy terms, so long as there existed a genuine issue as [to] the insurer's liability."). As the California Court of Appeal summarized:

> As long as the insurer's coverage decision was reasonable, it will have no liability for breach of the covenant of good faith and fair dealing. An insurer which denies benefits reasonably, but incorrectly, will be liable only for damages flowing from the breach of contract, i.e., the policy benefits.

*Griffin Dewatering Corp. v. N. Ins. Co. of N.Y.*, 176 Cal.App.4th 172, 196, 97 Cal. Rptr.3d 568 (2009) (quoting *Morris v. Paul Revere Life Ins. Co.*, 109 Cal.App.4th 966, 977, 135 Cal.Rptr.2d 718 (2003)) (emphasis omitted). Even if the Court were to find that Dr. Bilezikjian's CTS disability was an "accidental bodily injury" entitling him to benefits, Unum Life's coverage position based on California case law was objectively reasonable and created a genuine issue of coverage.

## VI.

### DISCUSSION

Having reviewed the parties' positions, the Court finds itself in agreement with Justice Roth's view:

> [A] tautological review of the various expressions in the opinions dealing with the subject will tend to incline the analyst first to one view of the case and then to the other, [and] what emerges as the foundation upon which disposition of the cause must rest is simply a common sense appraisal of what is by any reasonable understanding the nature of an "accident" policy of insurance.

*Williams*, 158 Cal.App.3d at 234, 204 Cal. Rptr. 453. Here, the common sense appraisal is required of the "Accident Total Disability" rider that covered "accidental bodily injury," which in turn was part of a disability income policy covering "injury" and "sickness." Dr. Bilezikjian's own actions, while certainly not dispositive of the issue presented here, nevertheless shed light on the common sense appraisal required in this case.

When Dr. Bilezikjian filled out his claim form, he was asked whether he had an injury and, if so, where and how it occurred. (Shea Decl., Ex. 7.) He drew a line in the space left for his description, indicating that the question was inapplicable. He also left blank the date the injury

occurred. Thus, when the insured made his claims, he did not consider CTS to be an injury. And, when Unum Life conferred coverage, it did so under the "sickness" provision of his policies. (Bilezikjian Decl., Ex. 6 at 66.) Dr. Bilezikjian did not question this characterization of his disabling condition, nor refuse Unum Life's payment under it. It was 16 months later when Dr. Bilezikjian first attempted to recharacterize his disability as an accidental bodily injury. (Shea Decl., Ex 10.)

Dr. Bilezikjian's initial impulse accords with California law. A common sense appraisal of the phrase "accidental bodily injury," whether defined as "accidental means" or "accidental results," connotes an injury produced by a sudden event. Stated according to the applicable legal standard, the Court finds that there is no convincing evidence that the California Supreme Court likely would not follow the Court of Appeal's holding in *Gin*, 134 Cal. App.4th at 940, 36 Cal.Rptr.3d 571 and the precedents cited therein. *See Chalk*, 560 F.3d at 1092.

## A. "Accidental Bodily Injury" requires a sudden event causing injury

■ *Gin* held that CTS was not an "accidental bodily injury" because the microtraumas, which in that case were caused by the repetitive stress of typing, "did not each manifest themselves at an identifiable time and did not cause an identifiable harm at the time they occurred." 134 Cal.App.4th at 945, 36 Cal.Rptr.3d 571. Instead, CTS was the result of a "series of imperceptible events that finally culminated in a single tangible harm." *Id.* (quoting *Geddes & Smith*, 51 Cal.2d at 564, 334 P.2d 881.) In other words, an accidental bodily injury requires a sudden event causing an identifiable injury.

Dr. Bilezikjian criticizes *Gin* because it did not distinguish between injuries covered under "accidental results" policy versus those covered by "accidental means." He takes the position that "accidental results" provide coverage for accidental (i.e., unintended) outcomes, and it is undisputed that he did not intend to develop CTS as a result of his surgical activities. While the California Supreme Court recognized that accidental death policies are construed broadly, "such that injury or death is likely to be covered unless the insured virtually intended his injury or death," *Weil*, 7 Cal.4th at 140, 27 Cal.Rptr.2d 316, 866 P.2d 774, this does not mean that they are construed so broadly as to include any actions repeated over a series of years that lead to death or injury.

The *Nehra* case provides an apt hypothetical situation: while someone might be covered under an insurance policy providing benefits for "accidental results" if he unintentionally dies of acute alcohol poisoning by voluntarily drinking too much on a single occasion, the same would not be true if drinking occurred over many years and gradually eroded the vital organs leading to death. *Nehra*, 454 Mich. at 117–18, 559 N.W.2d 48. In the latter example, death might well have been unintended, but no one could reasonably call it "accidental" because no sudden event would have precipitated organ failure. In short, the phrase "accidental result," as used in insurance policies governed by California law, is not synonymous with "unintended injury," nor can it be reduced to it. " 'Any given event, including an injury, is always the result of many causes.' For that reason, the law looks for purposes of causation analysis 'to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability.' " *Delgado v. Interins. Exch. of the Auto. Club of S. Cal.*, 47 Cal.4th 302, 315, 97 Cal.Rptr.3d 298, 211 P.3d 1083 (2009) (citations omitted).

However broadly one construes "accidental result," it cannot be construed so broadly so as to divorce the temporal and spatial relationship with the actions, whether voluntarily or involuntarily taken, that ultimately produce the accidental result.[13] To be sure, Georgia has taken a different view of "accidental bodily injury." However, given that the California Courts of Appeal have consistently required a "sudden event" for accidental bodily injuries, as demonstrated in *Alessandro*, *Williams*, and Gin, while other states, such as Georgia, have reached opposition conclusions over this issue,[14] the Court is not persuaded that the California Supreme Court would make a ruling different from the California Courts of Appeal.[15] *See Chalk*, 560 F.3d at 1092 (stating that federal courts sitting in diversity "must follow the state intermediate appellate court decisions unless the [court] finds convincing evidence that the state's supreme court likely would not follow it.")

It stands undisputed that Dr. Bilezikjian gradually developed CTS over a number of years while working as an orthopedic surgeon. While his condition ultimately prevented him from continuing his surgical practice, no sudden event triggered his CTS. Accordingly, Dr. Bilezikjian's CTS disability is not considered an "accidental bodily injury" under California law.

## B. The Policies are not ambiguous

■ The Policies are not ambiguous with respect to coverage. Interpretation of an insurance policy is a question of law, which is determined by looking first "to the language of the contract in order to ascertain its plain meaning or the meaning a lay person would ordinarily attach to it." *Waller v. Truck Ins. Exch. Inc.*, 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995) (citing Cal. Civil Code § 1638). Interpretation "must give effect to the 'mutual intention' of the parties," which should be "inferred, if possible, solely from the written provisions of the contract." *Id.* (citing Cal. Civil Code § 1639). A policy provision is considered "ambiguous when it is capable of two or more constructions, both of which are reasonable." *Id.* However, "[m]ultiple or broad meanings do not necessarily create ambiguity." *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal.4th 854, 868, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (1993) (finding no ambi-

---

13. Requiring actions to have a temporal and spatial relationship with the accidental result does not conflate the meaning of "accidental results" with "accidental means." Both terms require an "unanticipated result," but only "accidental means" requires that the cause of the result be involuntary or unforeseeable. *See Weil*, 7 Cal.4th at 141, 27 Cal. Rptr.2d 316, 866 P.2d 774 ("accidental means" limits liability of insurance companies for unintended results of the insured's voluntary acts unless there was (1) an "intervening accident or an accidental element," or (2) the "effect [of a voluntary act] is not the natural, probable, or expected consequence of the means that produced it.") In this ruling, the Court recognizes another unremarkable requirement for both terms: that the action producing the result, whether voluntarily or involuntarily taken, be temporally and spatially connected with the resulting injury.

14. At the hearing, plaintiff's counsel argued that the fact that states were coming out with different results when interpreting the same contractual provisions is proof of ambiguity. However, since insurance regulation is generally a product of state law, it should not be surprising, let alone serve as an indicator of ambiguity, that states come to different conclusions when interpreting similar insurance policies owing to the differences in state law.

15. Although the Court reaches its conclusion even if the distinction between "accidental results" and "accidental means" is applied to disability income policies, it is unclear whether the California Supreme Court would strictly apply that distinction outside the context of "accidental death" or life insurance policies.

guity in a contract term susceptible to two meanings because one of the two constructions was not reasonable). And, "policy language is not misleading and unenforceable just because it could be more explicit or precise." *Van Ness v. Blue Cross of Cal.*, 87 Cal.App.4th 364, 375 n. 4, 104 Cal.Rptr.2d 511 (2001); *see also Waller*, 11 Cal.4th at 18–19, 44 Cal.Rptr.2d 370, 900 P.2d 619 ("Courts will not strain to create an ambiguity where none exists.")

The Bilezikjian Policies are not ambiguous with respect to his claim for disability benefits caused by CTS. First, California courts have long interpreted similar policies dividing coverage based on "sickness" and "injury" without finding ambiguity. *See Alessandro*, 232 Cal.App.2d at 204–05, 209, 42 Cal.Rptr. 630. Second, interpretation "must give effect to the 'mutual intention' of the parties," which should be "inferred, if possible, solely from the written provisions of the contract." *Waller*, 11 Cal.4th at 18, 44 Cal.Rptr.2d 370, 900 P.2d 619. There is no indication, and it is unlikely, that the parties contemplated that "accidental bodily injuries" covered disabilities resulting from the ordinary wear and tear of professional practice. Third, the applicable policy provision is not ambiguous under California law because all "accidental" injuries, whether caused by voluntary actions or not, require a sudden event that causes the accidental result.

There is no resulting ambiguity when the Policies are read as a whole. Dr. Bilezikjian's deductive argument, i.e., (1) his policies divide disability into the two categories of sickness and injury; (2) he is disabled; (3) there is no evidence his disability was caused by sickness; and, therefore, (4) he should be covered under the "injury" category, misses the mark because it concludes, without actually establishing, that his disability should not be covered under the "sickness" category. As the Michigan Supreme Court recognized, a disability such as CTS might very well be considered a "chronic injury" in one context, but a "sickness or disease" in the context of a disability policy that limits the definition of "injuries" to *accidental* bodily injuries." *Id.* at 118 n. 14, 559 N.W.2d 48.

*Webster's Dictionary* defines "disease" as "a condition of the living animal or plant body or of one of its parts that impairs the performance of a vital function: SICKNESS, MALADY."[16] *Webster's New Collegiate Dictionary*, 327 (1973). CTS fits into *Webster's* definition: it is a "condition" that "impairs the performance of a vital function."[17] Given this definition, it is reasonable to say that CTS falls under the "sickness or disease" category rather than

---

**16.** Since the Policies were first issued in 1975, this 1973 version seems particularly relevant. A more recent edition defines "disease" as "an abnormal condition of an organism or part that impairs normal physiological functioning, esp. as a result of infection, inherent weakness, or environmental stress." *Webster's II: New Riverside University Dictionary*, 385 (1994). Even under the newer definition, the disease label fits CTS: an abnormal condition that impairs normal physiological functioning as a result of environmental stress.

**17.** This distinction also makes sense when viewed from the types of risk associated with "sickness" and "accidental injuries." As noted in a prominent California treatise, disability policies regularly distinguish between disabilities caused by illness and those resulting in accidental injury. H. Walter Croskey, et al., California Practice Guide: Insurance Litigation (The Rutter Group 2009) ¶ 6:639. "Typically, a shorter period of benefits is provided based on sickness (e.g., 2 or 3 years, maximum); while longer benefits are payable for disabilities resulting from accidental injury (e.g., lifetime payments, or until age 65)." *Id.* As the authors note, "[t]his distinction is justified by the fact that far fewer disabilities result from accident than illness, so greater benefits can be provided." *Id.*

"accidental bodily injury" category with its limiting spatial and temporal connotations.[18] Because interpretation of an insurance policy is governed by the "plain meaning or the meaning a lay person would ordinarily attach to it," *Waller*, 11 Cal.4th at 18, 44 Cal.Rptr.2d 370, 900 P.2d 619, rather than the precise etiology of a given disability as established by medical experts, understanding CTS as an illness would not be unreasonable. Dr. Bilezikjian's Policies are not ambiguous. Accordingly, Unum Life did not breach its insurance agreements with Dr. Bilezikjian when it concluded that his CTS was not covered under the Policies.

## C. Breach of the Implied Covenant of Good Faith and Fair Dealing

For the reasons set forth by Unum Life—that there has been no breach of contract and, in any event, there has been a good faith dispute over coverage—Dr. Bilezikjian's claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law.

## D. Plaintiff's Prayer for Punitive Damages

Unum Life contends that Dr. Bilezikjian's prayer for punitive damages fails without an underlying tort of bad faith. *See Franceschi*, 852 F.2d at 1220–21 ("For the same reasons that [plaintiff's] bad faith claims were properly dismissed, punitive damages are not recoverable.") Plaintiff did not file opposition to Unum's motion.

Under the authority cited by Unum Life, Dr. Bilezikjian is not entitled to punitive damages.

## VII.

### *CONCLUSION*

Accordingly and for the foregoing reasons, plaintiff Dr. Zaven Bilezikjian's motion for summary adjudication is denied, and Unum Life's motion for summary judgment is granted in its entirety.[19]

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Order on counsel for all parties in this action. The clerk shall enter Judgment in accordance with this Order.

ORDER GRANTING DEFENDANT'S MOTION FOR AN ORDER PERMITTING PUBLICATION OF THIS COURT'S JANUARY 25, 2010 MEMORANDUM ORDER

Defendants Unum Life Insurance Company of America and Unum Group's motion for an Order permitting publication in the official reporter of this Court's January 25, 2010 Memorandum Order issued in the above-captioned case came before the Court in chambers.

Having considered the moving papers and all relevant pleadings, and there having been no opposition thereto, IT IS THEREFORE ORDERED that this Court's January 25, 2010 Memorandum

---

18. In *Khatchatrian v. Continental Cas. Co.*, 332 F.3d 1227, 1229 (9th Cir.2003), the Court of Appeals for the Ninth Circuit held that for a death to be considered an "accidental death," it "must occur from external rather than natural causes." The court pointed out that this conclusion was "consistent with the leading treatise on insurance law, which explains that an 'accident' must entail '[s]ome form of external events and forces, as opposed to purely "natural" processes, with nat-

ural processes—aging, congenital defects and disorders, cancer, and like conditions—generally not considered an "accident." ' " Simply because an "accident" requires some "external events or forces" does not mean that all disabilities caused by "external events or forces" are "accidents."

19. This case may be a candidate for certification to the California Supreme Court under Rule 8.548 of the California Rules of Court.

Order shall be released for publication in the official reporter.

IT IS SO ORDERED.